**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| ANGELA GLAZER and MICHAEL GLAZER,<br><br>    Plaintiffs,<br><br>        v.<br><br>NATIONWIDE MUTUAL INSURANCE COMPANY and NATIONWIDE INSURANCE COMPANY OF AMERICA,<br><br>    Defendants. | CIVIL ACTION NO. 3:10-cv-1366<br><br>(JUDGE CAPUTO) |

## MEMORANDUM

Presently before the Court are two motions for summary judgment by Defendant Nationwide Insurance Company of America ("NICOA"). (Docs. 31 & 34.) The Plaintiffs in this lawsuit, husband and wife, are seeking underinsured motorist ("UIM") benefits from the Defendants for injuries sustained by Plaintiff Angela Glazer when she was hit by an underinsured motorist while driving a car belonging to her son, Jason Woelkers. NICOA has filed a separate motion for summary judgment as to each of its two policies at issue, and seeks declarations that the Plaintiffs cannot recover under either Michael Glazer or Jason Woelkers's policy. Since Michael Glazer's auto insurance policy was not in force at the time of the accident, and because Jason Woelkers declined underinsured motorist benefits under his policy, NICOA's motions for summary judgment will be granted.

## BACKGROUND

On October 12, 2005, Plaintiff Angela Glazer sustained injuries while driving a 2003 Jaguar which was struck by a vehicle being operated by Osbert J. Patton, Jr. (Defs.' Stmt.

at ¶¶ 1, 4, Doc. 33.)  The Jaguar belonged to Glazer's son, Jason Woelkers, who insured it with Defendant Nationwide Insurance Company of America ("NICOA").  (*Id.* at ¶ 4.)  Plaintiffs made a claim against Patton for recovery, which Patton settled for $100,000, the limit of his liability coverage under his auto policy insurance.  (*Id.* at ¶ 11.)  Plaintiffs then sought to recover underinsured motorist benefits from NICOA under both Jason Woelkers's Personal Auto Policy (*Id.* at ¶ 12), as well as Michael Glazer's personal auto policy. (Defs.' Stmt. at ¶¶ 1,4, 13, Doc. 36.)  The Defendants declined to pay UIM benefits under either policy, and the Plaintiffs filed suit seeking a declaration that the Defendants were obligated to pay UIM benefits under both policies.

This matter was initially filed in the Court of Common Pleas of Lackawanna County and was removed to the Middle District of Pennsylvania pursuant to diversity jurisdiction on July 1, 2010.  On February 22, 2011, the Defendants filed their Answer to the Complaint, asserting separate counterclaims each seeking declaratory and injunctive relief as well as attorneys' fees and costs.  On December 28, 2012, Defendant NICOA filed two separate motions for summary judgment on each one of the insurance policies.  (Docs. 31 & 34.)  These motions, similar to the counterclaims, request judgment in favor of NICOA, as well as a declaration that the Plaintiffs may not maintain a claim for recovery against NICOA under either policy in connection with the October 12, 2005 accident.  These two motions have been fully briefed and are now ripe for the Court's review.

**1.      Jason Woelkers' Policy with NICOA (# 58 37 C 862214)**

NICOA issued an auto insurance policy to Jason Woelkers on January 6, 1995. (Pls.' Ex. at 2, Doc. 37-1.)  This policy remained in full force and effect through all relevant events

to this suit. (Defs.' Stmt. at ¶ 13, Doc. 33.) At the inception of his policy, on December 20, 1994, Woelkers signed a Rejection of Underinsured Motorist Protection form. (*Id.* at ¶ 15; Defs.' Ex. D.) Woelkers's policy initially insured only a 1988 Buick, but as the policy progressed, cars were added, exchanged, and subtracted. (Pls.' Ex. A.) The evidence shows that, at the time of the accident, Woelkers's policy covered a 2002 Ford Explorer, a 1990 Chevy Pickup, and a 2003 Jaguar X-Type. (*Id.* at 57-58.) There is no evidence in the record that any other rejection form was ever obtained from Woelkers by NICOA beyond the initial 1994 form. (Pls.' Stmt. at ¶ 15, Doc. 37; Pls. Counter Stmt. at ¶ 9, Doc. 37.) In particular, when Woelkers added the 2003 Jaguar to his policy in April of 2005, there is no evidence that he affirmatively waived UIM coverage as to that vehicle. (Pls. Counter Stmt. at ¶ 5, Doc. 37.) As such, the Plaintiffs argue they are entitled to UIM benefits as insurance companies in Pennsylvania are "required to obtain a signed UIM rejection form for each newly acquired vehicle in excess of the original vehicle on the policy." (Pls.' Br. at 2, Doc. 39.)

### 2. **Michael Glazer's Policy with NICOA (# 58 37 D 68977)**

Michael Glazer also maintained an auto insurance policy which neither party disputes extended to his wife, Angela Glazer. The Defendants further admit that this policy would ordinarily provide UIM benefits. (Defs.' Br. at 4, Doc. 35.) However, they argue that the policy was not in effect as of the time of the accident as it was cancelled for non-payment on October 4, 2005 and reinstated after the accident, on November 1, 2005. (*Id.*)

Prior to the accident, this policy was last renewed on August 20, 2005. (Defs.' Ex. D-2 at 7, Doc. 34-7.) It appears that no payment was made at the time of this renewal and no

3

payment was subsequently received.  (*Id.*)  As such, in a Notice of Cancellation dated September 17, 2005, NICOA informed policyholder Michael Glazer that his "Automobile Insurance Policy is CANCELLED for NON-PAYMENT of the premium due at 12:01 A.M. on October 04, 2005," but that his "policy will not cancel if a valid payment of the premium due is received before the cancellation date."  (*Id.*; Defs.' Ex. D-1 at 2, Doc. 34-6.)

Angela Glazer, who was dealing at the time with her husband's recent heart attack, testified that she did not even open the aforementioned notice until after the alleged cancellation date of October 4, 2005. (Glazer Dep. 10:22-11:14, Sept. 30, 2011, Defs.' Ex. F.)  Yet, when she finally presented her insurance agent with a check for the amount requested in the Notice of Cancellation, she was told it would not be enough to make the policy current.  (*Id.* at 15:15-18, 19:4-9.)   Thus, she voided the check for $487.36 and handed over a new one for $597. (*Id.* at 15:15-21; Defs.' Ex. D-2 at 7.)  Although it was not discussed, Glazer presumed that because the amount was higher it covered the entire period and that there would be no lapse in coverage.  (*Id.* at 16:12-21, 19:21-20:8.)  While the full details of this factual dispute will be set out in the relevant section below, the Plaintiffs continue to argue that they are entitled to full UIM benefits as Angela Glazer "nonetheless paid the full premium due to reinstate the policy retroactive to October 4, 2005."  (Pls.' Br. at 2, Doc. 42.)

## **LEGAL STANDARD**

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c)(2).

A fact is material if proof of its existence or nonexistence might affect the outcome of the suit under the applicable substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

Where there is no material fact in dispute, the moving party need only establish that it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c)(2). Where, however, there is a disputed issue of material fact, summary judgment is appropriate only if the factual dispute is not a genuine one. *Anderson*, 477 U.S. at 248. An issue of material fact is genuine if "a reasonable jury could return a verdict for the nonmoving party." *Id.* Where there is a material fact in dispute, the moving party has the initial burden of proving that: (1) there is no genuine issue of material fact; and (2) the moving party is entitled to judgment as a matter of law. *See* 2D Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2727 (2d ed. 1983). The moving party may present its own evidence or, where the nonmoving party has the burden of proof, simply point out to the court that "the nonmoving party has failed to make a sufficient showing on an essential element of her case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

"When considering whether there exist genuine issues of material fact, the court is required to examine the evidence of record in the light most favorable to the party opposing summary judgment, and resolve all reasonable inferences in that party's favor." *Wishkin v. Potter*, 476 F.3d 180, 184 (3d Cir. 2007). Once the moving party has satisfied its initial burden, the burden shifts to the non-moving party to either present affirmative evidence supporting its version of the material facts or to refute the moving party's contention that the facts entitle it to judgment as a matter of law. *Anderson*, 477 U.S. at 256–57. The Court

5

need not accept mere conclusory allegations, whether they are made in the complaint or a sworn statement. *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990).

"To prevail on a motion for summary judgment, the non-moving party must show specific facts such that a reasonable jury could find in that party's favor, thereby establishing a genuine issue of fact for trial." *Galli v. New Jersey Meadowlands Comm'n*, 490 F.3d 265, 270 (3d Cir. 2007) (citing Fed. R. Civ. P. 56(e)). "While the evidence that the non-moving party presents may be either direct or circumstantial, and need not be as great as a preponderance, the evidence must be more than a scintilla." *Id.* (quoting *Hugh v. Butler County Family YMCA*, 418 F.3d 265, 267 (3d Cir. 2005)). In deciding a motion for summary judgment, "the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249.

## **DISCUSSION**

Defendant NICOA has brought two separate motions for summary judgment seeking declarations that it has no duty to pay UIM benefits on either of its policies at issue in this case. In the first section, the Court holds that summary judgment in favor of NICOA is appropriate as Jason Woelkers's policy contained a valid UIM coverage waiver. In the second section, the Court holds that summary judgment in NICOA's favor is also appropriate as to Michael Glazer's policy, which had lapsed at the time of the accident and was therefore not providing any UIM coverage. These two particular issues will now be addressed more fully below.

**1.   Defendant Nationwide Insurance Company of America's Motion for Summary Judgment as to Jason Woelkers's Policy (Doc. 31)**

Plaintiff Angela Glazer was operating Jason Woelkers's 2003 Jaguar when she was hit by Osbert J. Patton, Jr.  (Def.'s Stmt. at ¶ 4, Doc. 33.)  After exhausting Patton's $100,000 limit of liability coverage, the Plaintiffs sought to recover underinsured motorist benefits from NICOA under Woelkers's Personal Auto Policy.  (*Id.* at ¶ 12.)  At all relevant times, this policy was in full force and effect.  (*Id.* at ¶ 13.)  However, Woelkers signed a Rejection of Underinsured Motorist Protection Form on December 20, 1994.  (*Id.* at ¶ 15; Defs.' Ex. D.)  The Defendants argue that this rejection remains valid in regard to vehicles later added to the policy.

The Defendants argue that the original underinsured motorist waiver complies with all facets of the Pennsylvania Motor Vehicle Financial Responsibility Law ("MVFRL").  75 Pa.C.S. § 1701, *et seq*.  The Plaintiffs do not argue in their brief that the original waiver was insufficient, and any argument as such is deemed abandoned.  *See Glenn v. Raymour & Flanigan*, ___ F.Supp.2d ___, 2011 WL 6739461, at *6 (E.D. Pa. Dec. 22, 2011) (noting that a failure to address issues at summary judgment constitutes abandonment of those issues).  Moreover, there is no dispute that there were no further UIM rejection forms executed as to Woelkers's after-acquired vehicles.  Instead, the question is whether an insurer is required to obtain UIM rejection forms for each vehicle subsequently added to a policy.

Underinsured motorist insurance coverage protects named insured parties "who suffer injury arising out of the maintenance or use of a motor vehicle and are legally entitled to recover damages therefor from owners or operators of underinsured motor vehicles."  75 Pa.C.S. § 1731(c).  "The purpose of underinsured motorist coverage is to protect the insured

7

(and his additional insureds) from the risk that a negligent driver of another vehicle will cause injury to the insured (or his additional insureds) and will have inadequate liability coverage to compensate for the injuries caused by his negligence." *Wolgemuth v. Harleysville Mut. Ins. Co.*, 535 A.2d 1145, 1149 (Pa. Super. Ct. 1988). Section 1731 of the MVFRL provides for the availability, scope, and amount of uninsured and underinsured motorist coverage. While the purchase of such coverage is optional, it is mandatory for an insurer to offer it. 75 Pa.C.S. § 1731(a). In order to decline such coverage, the MVFRL requires particular rejection language printed on a separate sheet "in prominent type and location" which must be signed and dated by the first named insured. *Id.* at § 1731(c.1). Failure to secure a proper rejection will result in default UIM coverage equal to the bodily injury liability limits. *Id.* Further, § 1791 provides a standardized form, which, if properly presented to the insured, sets up a presumption that the insured has been fully appraised of the benefits and limits of the MVFRL and that "no other notice or rejection shall be required." Included in that section is a short explanation of UIM coverage and its benefits and availability.

Neither party cites, and the Court has not found, any particular authority directly on point as to the instant question: whether adding a new vehicle to an existing insurance policy requires a new UIM waiver form. As such, the Court must predict how the Supreme Court of Pennsylvania would interpret the applicable section of the MVFRL if presented with this issue. *Nationwide Mut. Ins. Co. v. Buffetta*, 230 F.3d 634, 637 (3d Cir. 2000). Without any particular guidance, a court "must look to decisions of state intermediate appellate courts, of federal courts interpreting that state's law, and of other state supreme courts that have addressed the issue." *Koppers Co. v. Aetna Cas. & Sur. Co.*, 98 F.3d 1440, 1445 (3d Cir. 1996) (citation omitted).

The Plaintiffs rely solely on the Supreme Court of Pennsylvania's decision and revised opinion in *Sackett v. Nationwide Mut. Ins. Co.* (*Sackett I*), 919 A.2d 194 (Pa. 2007), *modified on reargument*, 940 A.2d 329 (Pa. 2007) (*Sackett II*).  Those decisions, however, are not readily applicable to the facts of the instant case.  Specifically, those cases considered whether, under a different section of the MVFRL (§ 1738), the addition of a third vehicle to an existing insurance policy required an insured to have a renewed opportunity to waive stacked[1] uninsured and underinsured coverage.  *Sackett I* held that it did.  919 A.2d at 203.  Specifically, § 1738 requires that "[e]ach named insured *purchasing* uninsured or underinsured motorist coverage for more than one vehicle under a policy shall be provided the opportunity to waive the stacked limits of coverage."  75 Pa.C.S. § 1738(c) (emphasis added).  From this, the Supreme Court of Pennsylvania reasoned that, since the Sacketts could not have purchased underinsured motorist coverage for a vehicle they did not yet own, the purchase of that additional insurance only occurred after the acquisition of the third vehicle, triggering the necessity of a new stacking waiver.  919 A.2d at 202-03.

On reargument, *Sackett II* limited this broad holding in light of the Insurance Commissioner's representation that "once policies have been put into place, the Department has not treated the addition of a new vehicle . . . as a new purchase of coverage."  940 A.2d at 331.  In particular, newly acquired vehicle clauses allow consumers to automatically extend their existing coverage to newly-acquired vehicles.  *Id.*  Even the Sacketts agreed that such automatic coverage under a newly acquired vehicle clause did not execute a new

---

[1] "The concept of stacking relates to the ability to add coverages from other vehicles and/or different policies to provide a greater amount of coverage available under any one vehicle or policy."  *Everhart v. PMA Ins. Group*, 938 A.2d 301, 302 (Pa. 2007) (citation omitted).

9

purchase of coverage under the statute. *Id.* at 332. Thus, the Supreme Court of Pennsylvania held that vehicles temporarily added to a policy under an after-acquired-vehicle provision did not constitute a purchase of coverage and did not require a new uninsured or underinsured motorist stacking waiver. *Id.* at 334. However, the Court also reaffirmed *Sackett I* insofar as to vehicles added to a policy after the expiration of the automatic coverage under a newly-acquired vehicle clause.[2] *Id.*

In arriving at this rule regarding stacking waivers, *Sackett I* relied on the "plain language" of § 1738 which only considers the stacking of uninsured and underinsured benefits and the option to waive such stacking. 919 A.2d at 203; 75 Pa.C.S. § 1738. Moreover, the Supreme Court of Pennsylvania expressly noted that the stacking issue in *Sackett I* presented an entirely different question than a wholesale waiver of UIM benefits, which would fall under the purview of §§ 1731 and 1791. *Sackett I*, 919 A.2d at 198. As such, the Court declined to follow *Smith v. Hartford Ins. Co.*, 849 A.2d 277 (Pa. Super. Ct. 2004), which considered, like the instant case, a total waiver of UIM benefits. *Id.*

In fact, Smith is far more analogous to the matter *sub judice*. There, the trial court initially held, *sua sponte*, that increasing a policy's liability coverage triggered a new policy which required a new UIM rejection form. 849 A.2d 280. And, that court determined that any change an insurance the policy which was more than a "cosmetic change" created a new

---

[2]The Court of Appeals has further predicted "that the Supreme Court of Pennsylvania would extend its ruling in *Sackett II* to . . . single-vehicle polic[ies]." *State Auto Prop. & Cas. Ins. Co. v. Pro Design, P.C.*, 566 F.3d 86, 93 (3d Cir. 2009). That case, like the instant matter, concerned a single vehicle policy where two other vehicles were later added. The Circuit Court–noting that "the mere addition of a vehicle to an existing policy is not a purchase"–held that adding a second and third vehicle *did not* require additional waivers. *Id.*

policy as a matter of law. *Id.* The Superior Court of Pennsylvania rejected this outcome, finding that the language of the MVFRL required exactly the opposite. *Id.* at 281. In particular, requiring a new waiver of UIM benefits was incongruent with § 1791 which provides that, upon providing the appropriate statutory notice, "no other notice or rejection shall be required." The Superior Court held that once UIM benefits are rejected, "that decision carries forward until affirmatively changed." *Id.*

While the Supreme Court of Pennsylvania declined to follow *Smith* as to waivers of stacking under § 1738, it noted that "the conclusion in *Smith* was *required* by the relevant statutory language of Sections 1731 and 1791." *Sackett I*, 919 A.2d at 198 (emphasis added). These statutory provisions now require the same result in the instant case. Notably, § 1731 does not impose the same "purchase" requirement as § 1738, and the holding of *Sackett I* and *II* are literally inapplicable to the instant matter. Aside from this, the logic of *Sackett I* is not also compelling in light of the facts at hand. *Sackett I* held that a person could not purchase UIM benefits for a car they did not yet own, but upon purchasing such a car (and therefore new benefits), an insured would need to then consider the issue of stacking. This a result is compelled by the MVFRL, which requires an "opportunity to waive the stacked limits of coverage" when "purchasing uninsured or underinsured motorist coverage." 75 Pa.C.S. § 1738(c). Instead, where UIM coverage has been wholly waived, there is no automatic, subsequent purchase of UIM coverage when a new car is added to an existing insurance policy.

The holding of *Smith*–endorsed by the Pennsylvania Supreme Court in *Sackett I*–is ultimately compelling to the instant matter: that a decision to reject UIM benefits carries forward until affirmatively changed. In light of this interpretation, and because there is

nothing in § 1731 counseling otherwise, the original UIM waiver signed by Woelkers in 1994 was still in effect at the time of the accident and there were no UIM benefits available under his policy at the time of the accident. Thus, NICOA's Motion for Summary Judgment as to the Woelkers policy will be granted.

**2.    Defendant Nationwide Insurance Company of America's Motion for Summary Judgment as to the Michael Glazer Policy (Doc. 34)**

Defendants argue that Michael Glazer's personal auto insurance policy was not in effect at the time of the October 12, 2005 accident and therefore is not required to pay out UIM benefits for that accident. (Mot. at ¶ 15, Doc. 34.)

In a Notice of Cancellation dated September 17, 2005, NICOA informed policyholder Michael Glazer that his "Automobile Insurance Policy is CANCELLED for NON-PAYMENT of the premium due at 12:01 A.M. on October 04, 2005" and that his "policy will not cancel if a valid payment of the premium due is received before the cancellation date." (Defs.' Ex. D-1 at 2, Doc. 34-6.) That notice represented the "total due" as $487.86. (*Id.*) In a subsequent letter dated October 12, 2005, NICOA informed Michael Glazer that: "[y]our auto policy, although cancelled, still has an unpaid balance due. The premium you paid did not fully cover the actual time you had protection with us." (*Id.* at 5.) That letter sought a "total due" of $395.60. (*Id.*)

In her deposition, Angela Glazer was unsure when exactly she received the Notice of Cancellation. (Glazer Dep. 10:18-25, 12:9-16, Sept. 30, 2011, Defs.' Ex. F.) Unfortunately, it was a tumultuous period as Michael Glazer had recently experienced a serious heart attack requiring open-heart surgery. (*Id.* at 10:22-25, 12:9-16.) However, it was Glazer's belief that she did not even view the notice until after the purported cancellation

12

date of October 4, 2005.  (*Id.* at 11:24-12:8, 20:14-18.)  Further, Glazer attested that she did not recall ever seeing the October 12, 2005 collection letter.  (*Id.* at 12:17-23.)  At any rate, approximately one to two weeks after having opened the notice of cancellation, Glazer presented her insurance agent with a check in the amount of $487.36 as requested in the Notice of Cancellation, but was told it would not be enough to make the policy current.  (*Id.* at 15:15-18, 19:4-9.)   Thus, she voided the check for $487.36 and handed over a new one for $597.  (*Id.* at 15:18-21; Defs.' Ex. D-2 at 7.)  Although it was not discussed, Glazer presumed that because the amount was higher it covered the entire period and that no lapse had occurred.  (*Id.* at 16:12-21, 19:21-20:8.)  This visit to the agency took place on November 3, 2005.  (*Id.* at 16:6-8.)

Jacob Strevig, NICOA's Standard Auto Product Manager, confirmed at his deposition that the Glazers' policy had lapsed in the period between October 4, 2005 and November 1, 2005, although he was unclear as to how Angela Glazer's check for $597 was specifically applied to the account.  (Strevig Dep. 6:5-6, 20:18-21:1, Sept. 30, 2011, Defs.' Ex. D.)  Strevig had no personal knowledge of the Glazers' policy and was therefore unable to deduce exactly which amounts were applied to which periods of time.  (*Id.* at 8:6-18, 23:25-24:23, 20:18-21:7.)  He also confirmed that somebody else would need to testify as to the application of the $597.  (*Id.* at 20:18-21:7.)

Speaking generally, Strevig went on to clarify that–to the best of his knowledge–the $597 in question did not "include coverage for the period of time that has been alleged as a lapse."  (*Id.* at 62:12-15.)  This is because an insured would not be charged any insurance premiums for a period from cancellation to reinstatement.  (*Id.* at 61:8-16.)  Strevig explained that a notice of cancellation may require a higher amount than a later collection letter

because it would be seeking payment "for the portion of coverage which has been applied but also enough to reactivate a policy going forward." (*Id.* at 14:13-15:2.) In particular, it was possible that the $487.36 requested included $395.60 for previously unpaid coverage,[3] but also "an amount beyond October 4th." (*Id.* at 14:3-7.) Strevig further explained that insurance policies are not reinstated back to the cancellation date, but are "reinstated effective the day money [is] received." (*Id.* at 61:3-7.) He also noted that there exists a grace period beyond the date stated in a notice of cancellation, but could not state what the period was in this case. (*Id.* at 10:6-13, 11:2-23.) Finally, he could not point to any specific part of the policy discussing cancellation and reinstatement. (*Id.* at 21:22-22:15.)

Jeanette Bauerle, NICOA's Personalized Processing Supervisor, also confirmed in her deposition that the policy was in fact cancelled for non-payment of premiums as of October 4, 2005 and was reactivated on November 1, 2005.[4] (Bauerle Dep. 22:15-23:10, 24:20-23, Dec. 2, 2011, Defs.' Ex. E.) She also verified that, when NICOA reactivates

---

[3]Strevig confirmed that the collection letter dated October 12, 2005 sought a balance ($395.60) which reflected the period from "August 4th, 2005, which would have been the renewal date, through October 4th, 2005." (Strevig Dep. at 60:9-15.; Defs.' Ex. D-2 at 5.)

[4]While the parties agree that the reinstatement took place on November 1, 2005 (Pls.' Stmt. at ¶ 18, Doc. 40), Bauerle's testimony raised issues about the date of reactivation of the Glazers' policy with NICOA. Bauerle confirmed Strevig's observation that NICOA activates policies on the date the money was received. (*Id.* at 24:11-14, Strevig Dep. at 61:3-7.) Bauerle further noted that for activating policies, NICOA's system looks to the date a payment was remitted, not the date in which it entered the billing system. (Bauerle Dep. at 17:2-20.) For example, if the Glazers made a payment on November 7, it could not retroactively activate a policy on November 1–and any appearance of such retroactivity would be attributable to delays within NICOA's system. (*Id.* at 17:14-18:5.) Specifically, if a NICOA agent had received a check from the Glazers on November 3, 2005 it would be inconsistent with Bauerle's understanding that NICOA would then represent the policy as re-activating on November 1, 2005, which is what NICOA's records show. (*Id.* at 18:20-19:7.) Bauerle was unable to explain this inconsistency. (*Id.* at 18:8-11.)

policies like this, NICOA does not reactivate the policy back to the original cancellation date. (*Id.* at 24:7-10.)  Thus, in order for the Glazers to have kept their policy in effect without a lapse, they would have needed to pay the total due ($487.86) by the due date on the Notice of Cancellation: October 4, 2005.  (*Id.* at 6:5-8,13:8-14:7.)  This did not occur.  Furthermore, Bauerle explained that this amount is not pegged to any specific time period but instead relates to "installment bills that are open."  (*Id.* at 20:8-13.)

Notably, Bauerle sufficiently explained the discrepancy in the amount the Glazers owed in order to reinstate their policy.  She stated that the $597 paid by the Glazers reflected "a reinstatement amount which consists of the amount that would carry the policy up to the previous cancellation date, plus one month term premium for every month they're in new contract."  (*Id.* at 19:20-23.). This is because "Nationwide policy is to reinstate a policy with a lapse once the dollar amount needed is to pay them to current to the cancellation date plus one-sixth of the next term's review."  (*Id.* at 21:13-22.)  While Bauerle did not perform the actual calculations at her deposition, the math confirms her explanation.  Combining the amount necessary to bring the policy up to the cancellation date of October 4, 2005 ($395.60) and one-sixth of the new term's premium going forward ($201.40) arrives at the exact $597 paid.[5]  (*Id.* at 23:9-24:6.)  Bauerle's testimony therefore sufficiently explains the balance figures presented in the different policy notices.

The Plaintiffs present two facts in support of their proposition that although Angela Glazer "received a notice of cancellation, she nonetheless paid the full premium due to reinstate the policy retroactive to October 5, 2005." (Pls.' Br. at 2, Doc. 42.)  First, the

---

[5]The Court notes that $201.40 is exactly one-sixth of the Glazers' premium amount of $1,208.40 from the original policy renewal on August 20, 2005.  (Defs.' Ex. S-7.)

Plaintiffs point to the policy's November 5, 2005 Declarations page which notes that "Reinstated Coverage Lapsed From Oct 04, 2005 to Nov 01, 2005." (Ex. S-4 at 5.) Plaintiffs argue that "[t]his implies that the coverage lapse period was reinstated." (Pls.' Counter Stmt. at ¶ 3(g), Doc. 40.) The plain meaning of this statement, however, is that coverage–which had been reinstated on November 1, 2005–had lapsed from October 4, 2005 to November 1, 2005. Yet, the centerpiece of Plaintiffs' argument is that the difference in the amount required to *reinstate* the policy on November 1, 2005 and the amount to *settle* the account on October 12, 2005 is attributable to a retroactive payment for coverage for the disputed period. (Pls.' Br. at 6, Doc. 42.) This is not the case. As stated above, the facts in the record establish–to the exact cent–that the difference reflects a one-sixth payment of the premium in order to reestablish the account.[6] Neither of Plaintiffs' proffered facts presents a material fact in support of their argument.

Thus, from the record before the Court, there are no facts suggesting that Michael Glazer's policy with NICOA was in force between October 4, 2005 until at least November 1, 2005. Therefore, NICOA's Motion for Summary Judgment as to the Glazer policy will also be granted.

## **CONCLUSION**

Plaintiffs Angela and Michael Glazer cannot recover underinsured motorist benefits from Defendant NICOA under either Michael Glazer or Jason Woelkers's policy. Michael

---

[6]Plaintiffs specifically argue that the difference between the amount in the Notice of Cancellation ($487.36) and the amount paid on November 3 ($597.00) is attributable to payment for coverage between October 4, 2005 and November 1, 2005. (Pls.' Br. at 6, Doc. 42.) This is plainly incorrect. Looking beyond the rounding errors, Plaintiffs base this calculation on an annual insurance premium of $1,208.40, although this figure represents a six-month premium term. (Defs.' Ex. D-2 at 7, Doc. 34-7.)

Glazer's policy was not providing coverage as it had lapsed at the time of the accident, and Jason Woelkers's policy had waived such benefits.  Therefore, Defendant NICOA's motions for summary judgment will be granted.

While the Court would ordinarily direct the Clerk of Court to close such a case after granting summary judgment against the Plaintiffs' claims, here there are still outstanding counterclaims for attorney's fees which were not addressed by either party in their submissions.  There is also an outstanding Defendant, Nationwide Mutual Insurance Company, who, although represented by the same attorneys, apparently did not join in the instant motions for summary judgment.  Therefore, while the motions for summary judgment will be granted in favor of NICOA, the matter will remain open.  An appropriate order follows.


 May 17, 2012                                                          /s/ A. Richard Caputo
Date                                                                              A. Richard Caputo
                                                                                       United States District Judge